Fishback *v.* The State.

---

No. 16,542.

### FISHBACK *v.* THE STATE.

CONTEMPT.—*Newspaper Publication.—Reflection Upon Court or Grand Jury.*— The publication of an article reflecting upon the grand jury, tending to bring them into disrepute, and to embarrass and interrupt a legitimate investigation by them as to the commission of a crime at any time during their session, is subject to the cognizance of the court, and the author thereof is liable for contempt.

SAME.—*Answer Purging of.—Language not per se Libellous.*—When the language used in a newspaper article is not *per se* libellous, and only becomes so by the use of innuendoes, and is fairly susceptible of an innocent meaning, in so far as any reflection upon the court is concerned, and the defendant answers under oath that he used it in a sense not libellous, and declares he intended no imputation upon the court, either impugning the motives or integrity of the judge, or to embarrass the administration of justice, his answer must be taken as conclusive. The

Fishback *v.* The State.

disclaimer also applies to the grand jury. The judge himself can not assert facts existing in his own mind as against the answer. If he believes the facts stated are untrue, that issue may be tried, and the judge can testify as to the facts within his knowledge in a proper prosecution.

SAME.—*Language per se Libellous.*—*Insufficiency of Answer.*—If a newspaper article is *per se* libellous, making a direct charge against the court or jury, admitting of but one fair and reasonable construction, and requiring no innuendo to apply its meaning to the court, the publisher of the article can not escape liability for contempt by admitting the publication of the article, but denying that he intended the plain and mistakable meaning which the language used conveys.

SAME.— *What Necessary to Constitute.*—To constitute a contempt there must be an act coupled with an intended disrespect to or defiance of the court.

From the Vigo Circuit Court.

*W. Mack,* — *Henry, J. E. Piety, J. D. Piety, W. P. Fishback* and *W. A. Kappes,* for appellant.

*A. G. Smith,* Attorney General, for the State.

OLDS, J.—The prosecuting attorney of the Vigo Circuit Court, and of the Forty-third Judicial Circuit, filed his affidavit in said court, alleging, in substance, that in March, 1892, and prior thereto, the city of Terre Haute was engaged in building and repairing certain of her streets, and being desirous of building a sewer along and under one of her streets, her civil engineer, one Frank Cooper, was directed to make plans and specifications for such sewer, and to make an estimate of the cost of constructing the same; that Cooper made plans and specifications for such work, and estimated the cost thereof at $10,000, and the plans and specifications were adopted and approved by the city. And pursuant to law the city advertised for bids for the construction of the sewer, and received certain bids from various persons, stating amounts of each, and the contract was awarded to Frederick Fisher, his bid being the lowest, $14,-540,—each of the others was $15,000 and upwards; that afterwards, in March, 1892, it became and was a general

VOL. 131.—20

rumor in the city of Terre Haute, and it was published as a fact in two of the daily papers in said city, that certain of the bidders had combined and agreed to make the bids which they did, and that a certain firm should do the work and receive therefor $10,000, and $5,000 excess should be secretly divided between the others; that the bids made by the bidders were not good faith bids, and the work was not in fact worth more than $10,000, including reasonable profit for the contractor; that Fisher was not a member of the combination, and in consequence of his bid the object of the others was defeated. It was further rumored that the city engineer, Cooper, had been guilty of some fraud in connection with his duties as city engineer, and in connection with the planning of said sewer, and that he had entered into some combination with certain of said bidders.

It is alleged that it was believed by many of the citizens and residents of said city that said rumors and publications were true, and if true some crime or misdemeanor against the laws of Indiana had been committed; that, on the — day of March, 1892, the grand jury of Vigo county began an investigation of the letting of such sewer contract and of said alleged combination bids, and of the alleged misconduct of said Cooper and said contractors; that afterwards, on the 29th day of March, 1892, it was rumored in said city that the grand jury had ceased its said investigation in relation to the aforesaid matters and in relation to the alleged misconduct of said Cooper and contractors; that Cooper was a republican, and T. W. Kinser, of T. W. Kinser & Son, one of the bidders on said work, was a democrat; that the Honorable David N. Taylor, judge of the Vigo Circuit Court, and the prosecuting attorney, were democrats, and that the political sentiments of such persons were well known to the citizens and residents of said city and county; that, on the 30th day of March, 1892, the appellant, William O. Fishback, was the editor of "The Terre Haute Express," a daily newspaper published in Terre Haute, and having a large cir-

Fishback v. The State.

culation in said city and in the county of Vigo; that, on March 30th, 1892, said appellant printed and published, and caused and procured to be printed, the following editorials in the Terre Haute Express of said date :

1st. "The best reason for redoubled effort to get at the bottom of these contract scandals, is the fact that certain influences are being brought to bear to shut off serious investigation."

2d. "The Gazette called upon the grand jury to investigate Peker. Why, it won't even investigate a republican when a democratic contractor is involved. Suppose the Gazette consults its friend, Judge Taylor, early this morning."

3d. "The array of lawyers to defend those who are to be investigated in this city scandal increases day by day, and the array of democratic fine-workers, who are doing day and night work in the case under the direction of the democratic bosses, is also increasing. Some days ago the Express called attention to the fact that it had been demonstrated that in every instance where unusually excessive profit was to be secured by the action of public officials, that democrats were the beneficiaries. Democratic lawyers are also the ones who are the politicians outside the court-room. The intelligence and integrity of the citizens' committee is the safeguard now."

It is further alleged that the Terre Haute Evening Gazette is a daily democratic newspaper, published in said city of Terre Haute; that Peker, referred to in the second editorial set out, was a democratic trustee of Harrison township, in Vigo county; that the Gazette, referred to in this editorial, was the Terre Haute Gazette; that said Gazette had, prior to said date, published charges against said Peker of misconduct as such trustee, and urged that the grand jury investigate in regard to said Peker's alleged misconduct.

It is further alleged that said appellant intended the readers of the Express to understand that the grand jury would not investigate the alleged misconduct in relation to the letting of the contract for the building of said sewer; that by

the sentence, " Why it won't investigate a republican when a democratic contractor is involved," said appellant meant and intended the readers of the Express to understand that the grand jury would not continue the investigation it had begun, and which, according to rumor, had been stopped, and would not investigate the republican engineer, Cooper, because T. W. Kinser, a democratic contractor, was involved.

It is further alleged that by said editorials said appellant meant and intended to be understood by the readers of the Express as charging that certain democratic politicians of Terre Haute, denominated " bosses " in said editorial, had an undue and improper influence over the grand jury and Judge Taylor of the Vigo Circuit Court, and that through such influences such court had been induced to stop the investigation of the conduct of said Cooper and said contractors ; and that it had been so induced to stop the work of the grand jury on account of T. W. Kinser, a contractor, being involved in said matter, and on account of the fact that said Kinser was a democrat ; that by the sentence, " The intelligence and integrity of the citizens' committee is the safeguard now," said appellant meant and intended that the readers of the Express should understand, and meant to charge publicly that the Vigo Circuit Court, and the officers and grand jury thereof, could not be relied upon to investigate the alleged misconduct of said Cooper and contractors, and that such court could not be relied upon to bring such alleged offenders to justice in case any offence against the criminal laws of Indiana had been committed ; that the readers of the Express understood the editorials and the various parts thereof according to the aforesaid intent and meaning of said Fishback.

Then follow averments denying the truth of the alleged charges, alleging that they are false, and alleging that the grand jury had not completed such investigation, that it was still continuing it, and had not adjourned, and was still in session, and that said editorials were so published by said

appellant for the purpose and with the intent of bringing the honorable Vigo Circuit Court, and the judge and grand jury thereof, into disrepute and disgrace, and with the purpose and intent of attacking the dignity and integrity of said court and its officers, and bringing said court into discredit with the people, and with the intent of embarrassing said court and its grand jury in the administration of justice in respect to the alleged misconduct of said contractors and said City Engineer Cooper.

Upon the filing of such affidavit the appellant was ruled to appear and show cause why he should not be attached and punished for contempt.

The appellant filed a verified answer to the affidavit, admitting that the said Gazette referred to in said editorial was the said Terre Haute Gazette, and that said Gazette had, prior to March 30th, 1892, published charges against said Peker of misconduct as such trustee, and had urged in its columns that the grand jury investigate said Peker on ac- account of his alleged misconduct, and alleging that on Tuesday evening, March 29th, he was informed by George M. Allen that a member of the grand jury had said that the investigation of said sewer charges by the grand jury had commenced that day, but had been suddenly stopped; that the Peker referred to was the township trustee who, during the existence of the grand jury in the last month, had been publicly charged with malfeasance in office, and said Gazette had insisted on the grand jury investigating said charges, but he is informed and believes it was never done; that at the time he wrote said article he honestly believed from his information that the investigation of the said sewer cases was stopped for political reasons, affecting both Democrats and Republicans, and he desired the examination to proceed, and called upon the editor of the Gazette, who was a friend of the judge, and had been in favor of grand jury investigation, to consult him; that he was informed and believed, and still believes, that the investigation by the grand jury

had been stopped and further investigation abandoned by the grand jury the day before this publication was made; that on Monday of this week he applied to the judge of the circuit court for leave to obtain affidavits of the grand jurors by whom he expected to prove, and could prove, that it was stopped; that the court refused to give him permission to do so, and he was unable to procure the same without it; that if he had been permitted by the court to obtain said affidavits he could have proven that said examination was by the grand jury stopped, witnesses sent home, and had never been resumed, and would not be resumed again by this grand jury, whose power will expire with this term on the 16th, and he would have filed the same herewith to substantiate said facts; that the publications complained of in the Express were in three separate paragraphs, or articles, as follows: And copies of each are set out, being the same as hereinbefore set out in the affidavit, and which we have numbered 1st, 2d and 3d. It is then alleged that by the first paragraph he intended only to urge a vigorous investigation of the alleged fraud; that as to the third article the appellant says that the report has been published that in addition to the alleged fraud as to the Crawford street sewer, other large contracts for sewers and street paving, to cost something like $200,000, had been let by the council in which there were suspicions of collusion and fraud, and the citizens' committee of one hundred, is the commitee referred to in said article as "the safeguard," who would protect the people and the taxpayers, no matter how many prominent lawyers might be employed. He did not understand that the citizens' committee was investigating the criminal view of the case, but were especially willing to protect the taxpayers; that said third article did not name the court or jury, nor can it from any reasonable interpretation be made to refer to them; that in writing and publishing said articles he did the same in good faith without any intention or design to embarrass or obstruct the proceedings of said court or said investiga-

tion, and disclaims any intention of imputing corrupt motives to the court or of interrupting, embarrassing or obstructing the administration of justice ; but on the contrary, was laboring in good faith to aid in the furtherance of justice, and asks to be discharged.

Upon the foregoing affidavit and verified answer the court found and adjudged the appellant guilty of contempt, and assessed his punishment at a fine of $100 and imprisonment in the county jail for the period of thirty days.

The appellant filed a motion for a new trial, which was overruled, and exceptions reserved, and this appeal is prosecuted.

The question presented is as to the correctness of the court's finding ; whether or not under these pleadings the court was authorized to adjudge the appellant guilty of contempt.

This depends, first, upon the sufficiency of the affidavit filed by the prosecuting attorney, and, second, if the affidavit properly charges a contempt, whether or not the answer of the appellant to the charges is sufficient to purge the appellant of such contempt and entitle him to an acquittal.

The view we take of the answer, which we will more fully state in the course of this opinion, renders it unnecessary to scrutinize the affidavit charging the contempt with a view of determining with certainty whether it is technically sufficient to compel the appellant to show cause why he should not be fined for contempt or not, for the appellant has answered the charge, and if his answer is sufficient to purge him of the contempt if properly charged he is entitled to an acquittal. We therefore proceed to the consideration of the case, conceding, without deciding, that the affidavit is sufficient.

In treating of the subject of contempt, Bishop, in his work on Criminal Law (7th ed.), vol. 2, section 243, says : " No court of justice could accomplish the objects of its existence unless it could in some way preserve order and enforce its mandates and decrees. The common method of

doing these things is by the process of contempt. Therefore the power to proceed thus is incident to every judicial tribunal, derived from its very constitution, without any express statutory aid."

The decisions of this court have approved and adhered to this doctrine.

In the case of *Little* v. *State*, 90 Ind. 338, it is said: "Among the inherent powers of a court of superior jurisdiction is that of maintaining its dignity, securing obedience to its process and rules, protecting its officers and jurors from indignity and wrong, rebuking interference with the conduct of business, and punishing unseemly behavior. This power is essential to the existence of the court. Without the power to punish for contempt, no others could, as decided in *United States* v. *Hudson*, 7 Cranch, 32, be effectively exercised. There is no doubt that the power to punish for contempt is an inherent one, for, independent of legislation, it exists, and has always existed, in the courts of England and America. It is in truth, impossible to conceive a superior court existing without such a power. The Legislature may regulate the exercise of this power—may prescribe rules of practice and procedure—but it can neither take it away nor materially impair it." See, also, *Cheadle* v. *State*, 110 Ind. 301.

We have in this case not a case of direct contempt, but a case of indirect or constructive contempt alleged to have been committed by the publication of these several articles in a daily newspaper, which are alleged, in view of the peculiar state of the public mind in the city in which said newspaper was published, were intended to, and did, prejudice the people against the court and grand jury, embarrass the administration of justice, and reflect upon the court and its proceedings.

In speaking of this class of contempts, in the case of *Cheadle* v. *State*, *supra*, the court says: "As regards indirect or constructive contempts, resulting from improper publications, Bishop, *supra*, in vol. 2, section 259, states the general

doctrine to be, that any publication, whether by parties or strangers, relating to a cause in court, which tends to prejudice the public as to its merits, and to corrupt or embarrass the administration of justice, may be visited as a contempt, and this includes reflections on the tribunal or its proceedings, or on the parties, the jurors, the witnesses or the counsel."

In the same case it is said: "The general rule is, that to constitute any publication a contempt, it must have reference to a matter then pending in court, and be of a character tending to the injury of pending proceedings upon it, and of the subsequent proceedings." Rapalje Contempts, section 56; 2 Bishop Criminal Law, section 262.

But as to the pendency of the action, it may be said that its pendency does not terminate with the return of the verdict of the jury or the rendition of the judgment, but may be said to be pending while it remains *in fieri*, for after judgment the parties are still in court for certain purposes. A motion for a new trial may be made and a new trial granted without additional notice.

As applicable to this case, though the grand jury may have stopped the examination, it was no bar to further investigation. It may have been renewed at any time, so that the publication of an article reflecting upon the grand jury, tending to bring them into disrepute and embarrass and interrupt a legitimate investigation by them as to the commission of a crime at any time during their session, would be subject to the cognizance of the court, and the author subjected to punishment if guilty of a contempt. The grand jury may be said to be open at all times during its session for the investigation of crimes of which they have jurisdiction, and the fact that they have made partial investigation and suspended, not intending at the time to pursue it further, does not prevent them from again taking it up and pursuing it.

In the case of *Burke* v. *State*, 47 Ind. 528, after a full review of the authorities, it is held that in a case of construct-

ive contempt, if the defendant appear and make a sworn statement that the matters in the affidavit are not true, and allege a state of facts consistent with his innocence, and avows that there was no intention to interfere, as in that case charged with the process of the court, he should be discharged, and that the court would not hear evidence of the truth of the original affidavit, or of the falsity of the answer.

This same rule is again held in the case of *Wilson* v. *State,* 57 Ind. 71, and in the case of *Ex parte Wright,* 65 Ind. 504, in speaking of constructive contempts the court says: " The judge can not, in a constructive contempt, from facts remaining in his own mind, exercise the judicial discretion resting in his breast, and grant either a rule *nisi,* or the writ of attachment. Such hidden facts can not be put upon record, nor pleaded to, nor controverted in any method known to judicial proceedings."

The authorities we have cited undoubtedly announce the true rule in cases where applicable, and must be followed in so far as applicable in cases of constructive contempts such as the one under consideration relating to the publication of a newspaper article, but there is a manifest distinction in newspaper articles which may be alleged to be libellous. If the article is *per se* libellous, making a direct charge against the court or jury, admitting of but one fair and reasonable construction, and requiring no innuendo to apply its meaning to the court, then it would be trifling with justice to say that in such a case the publisher could admit the publication, but deny that he intended the plain and unmistakable meaning which the language used conveys, but when the language used in an article is not *per se* libellous, and only becomes so, and made to apply to the court by the use of innuendoes, and is fairly susceptible of an innocent meaning in so far as any reflection upon the court is concerned, and the defendant answers under oath that he used it in a sense not libellous, and declares he intended no imputation upon the court,

either impugning the motives or integrity of the judge, or to embarrass the administration of justice, his answer must be taken as conclusive. If he swear falsely, he is liable to indictment and prosecution for perjury.

It must be remembered that while the right to punish for indirect contempt does and ought to exist in the court, and that in proper cases of clear and unqualified contempt, where parties seek by the publication of articles clearly and manifestly intended to bring the court into disrepute and to destroy confidence in it and embarrass the administration of justice, a court should not hesitate to exercise such power and punish the offender, yet such power is an arbitrary one, and if wantonly exercised would have a tendency rather to detract from than add to the respect and confidence reposed in the courts.

It is the judiciary that the people look to for protection of rights both of person and property, and it has the universal confidence of the people. Their acts are open to the world and all may judge of them, and an unjust and libellous assault upon a court by false or scurrilous articles usually proves more injurious to the author than the tribunal against which it is aimed, and it is not every comment which may seem to be uncomplimentary that a high and honorable court can deign to notice. *Stuart* v. *People*, 3 Scam. (Ill.) 395.

While the class of articles we have spoken of are unauthorized, and the publisher liable to punishment, on the other hand the public press have rights with which the court has no power to interfere, and it is indeed seldom that an honorable journalist so far forgets his self-respect as to trespass upon the rights of the judiciary, and seek to control or improperly influence, or bring discredit upon it. It is legitimate and proper for the press to call the attention of the judiciary, the grand jury, and the officers of the law, to violations of law believed to have been committed, and ask that there be an investigation, and if a crime has been committed

that it be prosecuted. The acts of the judiciary are subject to fair and honest-criticism the same as those of other public officers.

In the case at bar it seems to have been conceded by the prosecutor that the articles published in and of themselves did not cast any reflection upon the court such as rendered the author liable to be punished for contempt, for there was no attempt to make a charge against the appellant except by the aid of innuendoes, and if it were not so conceded we should be compelled to so hold.

The first article, standing alone, and it is conceded it was so published (the three were separate articles), has no application whatever to the court, or the grand jury, which is a part of the court, though a different rule in some respects might apply in .the punishment of a contempt for the publication of an article relating to the grand jury and one relating to the judge. Certainly, reading that article would not suggest to the mind of any one, even if all the rumors alleged existed, and he had knowledge of them, that the editor intended to make a charge of improper conduct on the part of the court or grand jury. If it can be made the basis of a prosecution for contempt at all, it is only by reason of the extrinsic facts and innuendoes alleged. And of this article the appellant in his verified answer says he only intended to urge a vigorous investigation of the alleged fraud.

The interpretation of the appellant is the natural inference from the language; it is consistent with the language, and is the reasonable interpretation of it.

Much of what we have said as to this article is applicable to the third article. If read in the light of the facts alleged in the affidavit, we can not think it can fairly be interpreted as making any charge against the court or grand jury, and certainly it had no tendency to obstruct or embarrass the administration of justice, and as to this article appellant says it did not name the court or jury, and can not by any reason-

able interpretation be made to refer to them, and he explains its application.

The second article is of a somewhat different character, it names both the judge and the grand jury. It is in the nature of a criticism on the grand jury for failing to discharge their duty. It can hardly be said to have any tendency to corrupt, embarrass or obstruct the administration of justice, or to make any charge against the judge. The appellant sets out the facts in relation to the writing of the article, and that he had been informed and he believed the investigation had been stopped, that he still believes it, that further investigation had been abandoned by the grand jury, and that if he was permitted to take the affidavits of the jurors he could prove that it was stopped, and witnesses sent home, and the investigation never to be resumed again.

As to all of these articles the appellant says that in writing and publishing said articles he did the same in good faith, without any intention or design to embarrass or obstruct the proceedings of said court or said investigation, and disclaims any intention of imputing corrupt motives to the court or of interrupting, embarrassing or obstructing the administration of justice.

It is unnecessary to determine whether or not the specific explanation as to the second article is sufficient to relieve the appellant from punishment, or as to whether the answer in fact affirms that the grand jury had in fact stopped the investigation and did not intend to resume it, and in such event whether or not the article was but just criticism or complaint of the action of the grand jury in thus abandoning such investigation without having pursued it sufficiently to ascertain whether or not there had been any crime committed, for the general statement in conclusion as to the writing and publishing of all of the articles disavows all intention of imputing any corrupt motives to the court, or of intending to interfere with the administration of justice, and this disclaimer applies alike to the grand jury as well as the judge,

for it is conceded that the grand jury is a part of the court, and this, together with the other averments, constitutes a complete and full defence to the charge of contempt.

To constitute a contempt there must be an act coupled with an intended disrespect or defiance of the court. Language may be used which conclusively proves such intent, but where the intent is uncertain from the language, and an intended disregard of and disrepect to the court are disavowed under oath, and it is asserted that an innocent and consistent use of the language was intended, it purges the contempt.

In Rapalje on Contempts, at section 115, it is said: "Again, inasmuch as the essence of a contempt consists, to a great extent, in the wilful defiance of the court and its authority, the entire absence of ' any intention of committing a contempt of the court, or any purpose to destroy or impair its authority, or the respect due thereto,' is a good defence." *Weeks* v. *Smith*, 3 Abb..P. R. (N. Y.) 211.

In *Ex parte Moore*, 63 N. C. 397, the court found and stated as a fact of record that, of the judge's own knowledge, the investigation by said grand jury was pending on the 30th day of March, 1892, and was not fully determined at the time of the publication of the articles.

Where, as in this case, the charge of contempt has to be made by alleging the surroundings and rumors existing in the minds of the public at the time, and by innuendoes showing that language, innocent and inoffensive as ordinarily interpreted, was used and intended to be understood as conveying a meaning which showed a disrespect and disregard of the court is charged as a contempt, the verified answer avowing an innocent use of the language and a disavowal of any intended disrespect for the court, or that it was used to corrupt, obstruct or embarrass the administration of justice, the answer must, under the well-settled rule of law, be taken as a verity, and it constitutes a complete defence to the charge. *In re Woolley*, 11 Ky. 95; *United States* v. *Dodge*, 2 Gallison, 312.

The Chicago, St. Louis and Pittsburgh R. R. Co. *v.* Fry, Administratrix.

The judge himself can not assert facts existing in his own mind as against the answer. In this the rule differs materially from that in case of a direct contempt. The defendant has verified an answer which constitutes a good defence. The court in such proceedings must take it as a verity. If the judge believes the facts stated are untrue, that issue may be tried, and the judge can testify to the facts within his knowledge in a proper prosecution.

It follows from the conclusion we have reached that the appellant was entitled to an acquittal on his verified answer in this case, and should have been discharged.

The finding of the defendant guilty was contrary to law, and the court erred in overruling appellant's motion for a new trial.

Judgment reversed, with instructions to sustain appellant's motion for a new trial, and to discharge him.

Filed April 22, 1892.