588:36 LRA 25
38 LRA 55

*In re* CHADWICK.

1. CONTEMPT OF COURT—POWER TO PUNISH.
    The power to punish for contempt is inherent in, and as ancient as, courts themselves.

2. SAME—STATUTORY LIMITATION.
    Whether the authority of the judiciary to punish for contempt of court is subject to limitation by legislative enactment, —*quære*.

3. SAME—RIGHTS OF ACCUSED—TRIAL BY JURY.
    Proceedings for contempt of court are not criminal causes, within the intent and meaning of the Federal and State Constitutions, and the accused is not entitled to a trial by jury.

4. SAME.
    The power of a *court of record* to punish for contempt persons guilty of vilifying the court in its judicial character is not limited to contempts arising out of *pending* proceedings.

5. SAME—CRITICISM OF DECREE.
    A letter criticising a decree, and charging the judge with sub-
        mitting to private interviews with interested parties in
        regard to the case pending his decision, and intimating
        unfairness and partiality upon the hearing, is an attack upon
        the official conduct of the court, and constitutes a contempt,
        for which the writer is liable.

6. SAME—ANSWER—DISAVOWAL OF INTENT.
    One guilty of publishing a report of a judicial proceeding,
        the only fair construction of which tends to defame and
        degrade the court in the eyes of the litigants and the public,
        cannot purge himself of the contempt by a denial of any
        intended wrong, and an assertion that he meant the publica-
        tion to bear a different and harmless construction.

*Certiorari* to St. Clair; Daboll, J., presiding. Sub-
mitted April 24, 1896. Decided June 30, 1896.

Anson E. Chadwick was found guilty of contempt of
court, and brings *certiorari*. Affirmed.

The respondent, Anson E. Chadwick, was found guilty
of contempt of court in the circuit court for the county of
St. Clair, and has brought the proceedings to this court
for review upon the writ of *certiorari*. Mr. Chadwick
was one of the solicitors for the defendant in the case of
*McMorran* v. *Fitzgerald*, 106 Mich. 649. The decree of
the court below was entered November 2, 1894. Judge
Vance was the judge of the St. Clair circuit. Judge
Eldredge, who heard and decided the case, was called in
by Judge Vance to preside at the hearing.

On the 8th of November, 1894, Mr. Chadwick wrote
and caused to be published on that day and the following,
in the Port Huron News, a newspaper published in the
city of Port Huron, the following letter:

*"Editor Port Huron News:* I am driven, by the con-
stant inquiries of citizens concerning the decision of Judge
Eldredge in the case of McMorran and Botsford against
Fitzgerald, and the impossibility of giving time for indi-
vidual information, to beg as much space as your indul-
gence will grant in a matter of this importance to the cit-

izens of Port Huron. James H. Fitzgerald, being burned
out, located his shops where now operated in the honest
belief in his right to do so, and positive knowledge that
it was the best location possible for his convenience and
that of his patrons. He and his counsel have no doubt
of his right to operate them as long as grass grows and
water runs without prohibition of any competent court on
a fair hearing. It is not the question of what the court
will do, but of his ability, in his circumstances, with the
present business depression, to bear the burden of a long
and expensive contest. In the testimony taken it was
proved that he had been threatened with financial and
social ruin if he attempted to build and operate these
shops on his own land at this point. So far they have
attempted to keep that pledge. They caused, by mislead-
ing or other inducement, the common council of this city,
without even giving Mr. Fitzgerald a hearing, to order a
suit and injunction to be brought and obtained against
him to stop the erection of part of his buildings,
thus compelling him to the expense of that contest
in getting the injunction dissolved, and the bill dis-
missed, as well as the delay in his work. Nobody
doubts that the common council were moved solely by
the influence of McMorran and his co-confederates to
take this step solely to help McMorran and others. This
failing, McMorran and Botsford, and those joined with
them, began their series of steps to ruin Mr. Fitzgerald
financially and socially, and have rained down on him
suits, threats against his customers, and every petty an-
noyance which could tend to destroy his business and eat
up his profits. It has been, not a question of injunction
and decree, but of how long Fitzgerald could last under
the enormous expense of continuous litigation. They
have caused their lawyers to write threatening letters to
every vessel owner on the lakes, such as threats of libel
should boats stop at Fitzgerald's in distress for repairs.

"While the citizens of Port Huron universally believe
Judge Vance to be an upright, independent judge and
man, these complainants judged him so unrighteously
that, on his refusal to give a private hearing to one of
the complainants' wives, she took possession of his cham-
ber, and drove him out, and assumed and declared that, if
he was too honest to hear her case privately, he was too
dishonest to decide it as she thought it ought to be decided,
and by persistent attacks upon him and his motives drove

him out of the case. Since the decision, a good deal
is known of facts which she and the complainants thought
warranted them in submitting the case to Judge Eldredge.
These reasons are an insult to Judge Eldredge, but they
care nothing about that, of course. It will surprise the
good citizens to know that this principal manager and
lobbyist of the complainants' case undertook to and did
make a trip to Mt. Clemens, in state, to wit, on their pri-
vate yacht, to visit and interview the judge. She thinks she
argued and submitted the case while there, and, of course,
the complainants agree with her. Now, Mr. Fitzgerald,
having expended a large amount of money in his defense
so far, and suffered inconceivable nuisances and injury
from their conduct, finds that an appeal to the Supreme
Court, which he has no doubt will result in an entire re-
versal and dismissal of the bill, will cost him further
large sums of money, and that he will be under the storm
of petty annoyances in pursuance of the threat and effort
to ruin him. What assurance has he that the city,
through its council, will not again lend its aid to these
people to oppress him; or, having recovered a final decree
dismissing all of complainants' suits and bills, with full
costs, and vindicating his right to remain and operate his
business there forever, he will not still be subjected to
other and constant trumped-up suits, the defense of which
will eat up all his earnings? The talk of good citizens
and candidates for city offices about doing everything to
promote manufacturing enterprises is sheer nonsense,
when these same good citizens stand by and see their in-
terests betrayed by their own officials, and see the destruc-
tion of existing industries by such means, which, of itself,
is a warning to any new ones not to attempt to establish
a business here. Mr. Fitzgerald cannot afford to work a
lifetime merely to earn money to spend upon courts or
counsel, even to defend an undoubted right. To set at
rest once for all any talk about any other site in the city
of Port Huron for Mr. Fitzgerald, I desire to say that he
will carry on his business where he now is, or, if he quits,
will quit the city with that business. He knows, and we
all know, if we had any sense, that this decree, as it
stands, is an absolute prohibition forever upon the erection
and maintenance of any manufacturing plant within 300
or 400 feet of any residence in the city limits, whether
worth $1,000 or $100,000, and will make the proprietor
subject to be blackmailed or driven out through any con-

spiracy of the owner or others, unless it is money, and not human rights, that now control the judgment of our courts.

"One word more. Within the radius of 1,000 feet from defendant's smokestack and steam hammer are eleven residences owned by their occupants. This appeared in the testimony. Will it not shock the sense and judgment of men to learn that of these eleven but four, to wit, John E. Botsford, Henry McMorran, and E. C. Carleton, desired the removal of these shops, or pretended to claim they were offensive in the least degree? But two of these residences were nearer than 300, feet, the other two from 450 to 800 feet. Three of these residences are but temporary homes for the owners, and they have not pretended for years to make them their permanent residences. Of the seven remaining residences the owners and occupants of five testified positively that they were so far from being a nuisance that they were not in anything the slightest annoyance; and these comprised not only the nearest, but, on the average, much nearer than the others; and these five owners were as clean in their habits, as intelligent and respectable, if not as rich, as the complainants.

"I will say one word more. It will surprise the great majority of the people of this city who have used their eyes, ears, and sense of smell for the last three years, and utterly failed to discover the thing complained of by the complainants, to find that Judge Eldredge, who refused to examine the premises and locality, although urgently and repeatedly requested to do so by defendant's solicitors, could find what they failed to discover. This decree prohibits Fitzgerald from even carrying on the business of banking, hotel keeping, warehousing, or merchandising on that property. Is that the law's decree, or is it the decree of a conspiracy to ruin Fitzgerald? The citizens can now deal with this matter; but, when they have decided, I caution them to look closely after their public servants, to see that the cold-blooded and silent lobby does not overrule them.

"A. E. CHADWICK."

A petition was filed in the circuit court for the county of St. Clair by A. R. Avery, P. H. Phillips, and E. W. Harris, members of the bar of St. Clair county, setting forth the above letter, and asking the court to proceed

against Mr. Chadwick for contempt. The petition was
accompanied by affidavits denying the material charges
made in the letter. To this petition the respondent made
answer by filing two affidavits, in the first of which he
stated that Judge Eldredge, who made the order of cita-
tion served upon him, was disqualified from sitting in the
matter by reason of his personal interest therein and re-
lation thereto, and by reason of his knowledge of facts
which would be controverted when a proper issue was
framed, and because he was a material and important wit-
ness for the respondent; that the matters complained
of, if a reflection upon the judge and his conduct, affected
him personally, and not as a court, and sitting as a
judge; that the object of that proceeding was not to
punish or try the respondent for contempt of court,
but was resorted to in the interest of complainants and
their agents for private vindication or satisfaction, as
well as the private vindication of said James B. El-
dredge, and not of said James B. Eldredge, circuit judge,
or sitting and acting as a court, since, on the face of the
record, there was not then, nor at the time of the publi-
cation, any suit pending or being tried in court between
McMorran and Botsford as complainants and the Fitz-
geralds as defendants. The second affidavit states that,
as to the facts set up in the letter, he believed them to be
true, and then argues at considerable length to show
that the letter was a justifiable criticism upon the decree
of the court, charges that the proceeding against him is
partisan, oppressive, and unlawful, and that the letter
does not reflect upon the judge, but upon complainants
and other persons. Interrogatories were framed, to
which the respondent interposed objection that some of
them involved immaterial matter, and in which he
accused the committee of partisan conduct, insisted that
his letter was not susceptible of the interpretation placed
upon it, and that he did not intend to attack the in-
tegrity, honesty, or motive of Judge Eldredge. He was

required, however, to answer the interrogatories, to one of which he answers as follows:

"That he emphatically denies that, either by direct assertions or by construction or implication, he charged or stated in said letter that the defendants were 'denied a fair hearing' by Judge Eldredge so far as he, Judge Eldredge, acted in, heard, or decided the cause, or that he was otherwise than fair, painstaking, courteous, honest, and sincere, or that he was in any sense unfair, corrupt, or dishonest. And respondent, writing in respect to the pleading, issue, and proceeding in the cause, intended, as seemed and seems to him plainly apparent, to refer to a rehearing on appeal, and to say that a jury, which was asked for in the answer, would have arrived at a different conclusion on the facts, and also that, had Judge Eldredge personally examined the premises and surroundings, as prayed in said answer, and seen defendants' shops in full operation under the conditions stated in said answer, to wit, under the absolute control of complainants themselves, he, Judge Eldredge, would have arrived at a different conclusion; the plain meaning being, not at all a criticism upon the motives, purity, integrity, and honesty of Judge Eldredge, but a mere statement that, had he exercised a different discretion as to ordering a jury or viewing the premises himself, the result might or would have been different; and respondent emphatically disclaims any—the slightest—doubt, or that he has had any—the slightest—doubt, but that Judge Eldredge is a man of high and pure motives and incorruptible integrity, and denies that his letter either does, or that by it he intended to, state otherwise, or reflect upon him in any manner; and respondent believes that no member of this bar has ever had at any time or at all times a higher respect or regard for Judge Eldredge than respondent. This respondent further most solemnly asserts that, wholly independent of any consequences to himself personally in this matter, or to his pleasant relations with Judge Eldredge in the future as in the past, he should most keenly, and all his life, regret deeply the possibility that he had said or written a word even tending in the slightest degree to detract from his high character as a man and lawyer, his usefulness on the bench, or raise a shadow of doubt of his perfect integrity, or wound his feelings as a man and gentleman, or that any

portion of said letter could be so differently construed than he intended."

S. B. Daboll, of the Twenty-Ninth judicial circuit, was called in to preside at the hearing. Testimony was taken, and the conclusion of the court, after hearing the case, was as follows:

"I find in the case that the respondent was an attorney and solicitor in this court during all the time covered by the matter in question; that he was solicitor for the defendants in said chancery suit; that the article was written and published by him during two days, or in two issues of the Port Huron News, a newspaper published in Port Huron, and circulated largely in Port Huron and St. Clair county; that the respondent, in said letter so written and published by him, deliberately charged and intended to charge:

"*First.* That the said defendants had not had a fair trial of the issue in said cause, but that they had been denied it.

"*Second.* That Judge Vance was driven out of the case, and Judge Eldredge procured to try it, because there was some reason—not a proper one—for wishing Judge Eldredge to try the case.

"*Third.* That the wife of one of the parties, who, it is claimed and stated in the letter, was the principal manager and lobbyist of the complainants' case, went to Mt. Clemens to interview Judge Eldredge in regard to the case, and argued and talked about the case, and was permitted to do so by the judge, in an improper and unbecoming manner, while the said case was under consideration and undetermined by him, tending to bring Judge Eldredge, and the administration of justice, and the court and its dignity and authority, into contempt and disgrace, and impair the standing and reputation of the court.

"*Fourth.* That he intended to charge and did charge in said letter that it is money, and not human rights, that control the judgment of our courts; and that the judgment in this case was brought about by the use and influence of money and wealth, and was not the honest and unbiased judgment of Judge Eldredge, based on justice and law.

"*Fifth.* That there was a conspiracy existing in the case aforesaid, in which the parties and judge were par-

ticipants, and that the decree therein was controlled by said conspiracy and money; and that the purpose of said conspiracy was to ruin and bankrupt Fitzgerald, the defendant in said cause.

"*Sixth.* That respondent was guilty of and did publish a false and grossly inaccurate account of proceedings of the court and of Judge Eldredge in stating that he allowed and permitted an interview, and · that he allowed and permitted an argument and submission of a case pending before him, by an interested party, under such circumstances as would render it highly improper to allow such interview, argument, submission, or discussion of the said case, or the issue thereof; that the entire letter is intended and well calculated to and did and does have the effect of greatly impairing the authority and dignity of the court and judge thereof, and does and did greatly lessen and impair the confidence of the public therein."

*J. B. McIlwain,* for appellant.

*A. R. Avery, P. H. Phillips,* and *E. W. Harris* (*William T. Mitchell,* of counsel),. committee for bar of St. Clair county.

GRANT, J. (*after stating the facts*). The power to punish for contempt is inherent in, and as ancient as, courts themselves. It is essential to the proper administration of the. law, to enable courts to enforce their orders, judgments, and decrees, and to preserve the confidence and respect of the people, without which the rights of the people cannot be maintained and enforced. Law writers and decisions, both ancient and modern, have recognized this power. Blackstone said:

"Contempts may arise by speaking or writing contemptuously of courts or judges acting in their judicial capacity, by printing false accounts of causes then depending in judgment, and by anything, in short, that demonstrates a gross want of that regard and respect which, when once courts of justice are deprived of, their authority, so necessary for the good order of the kingdom, is entirely lost among the people. The process of attachment for these and the like contempts must necessarily be as

ancient as the laws themselves. A power, therefore, in the supreme courts of justice to suppress such contempts by an attachment of the offender, results from the first principles of judicial establishments, and must be an inseparable attendant upon every superior tribunal. Accordingly, we find it actually exercised as early as the annals of our law extend. The contempts that are thus punished are either direct, which openly insult or resist the powers of the courts or the persons of the judges who preside there, or else are consequential, which (without such gross insolence or direct opposition) plainly tend to create an universal disregard of their authority." 4 Cooley, Bl. 283–286.

Similar statements of the existence and exercise of this power are found in other, earlier law writers. This power exists in the legislature, though it is not expressly authorized by the Constitution. " It is a necessary and incidental power, to enable the house to perform its high functions, and is necessary to the safety of the State. It is a power of protection." The judicial department of the government cannot review these proceedings before the legislature. Cooley, Const. Lim. 133, 134. Is it not equally essential and necessary for the protection of the courts? The Constitution of Michigan is entirely silent upon the subject of contempts, in both the legislative and judicial departments. The legislature, acting upon this power inherent in itself, early enacted provisions for the punishment of contempts of its authority. 1 How. Stat. §§ 38, 39.

Proceedings for contempt are not criminal causes within the intent and meaning of the Constitution of the United States or of this State. If they were, then the party accused of contempt would be entitled to a jury trial. Our own Constitution provides that "circuit courts shall have original jurisdiction in all matters, civil and criminal, not excepted in this Constitution and not prohibited by law." Article 6, § 8. It also provides that "in every criminal prosecution the accused shall have the right to a speedy and public trial by an impartial jury."

Article 6, § 28. We are not aware of any decision under a constitution similar to ours holding that one accused of contempt is entitled to a jury trial. It is apparent that this power should be lodged in the court. It is repugnant to all ideas of propriety to say that a jury should determine whether an act committed or statement made in the presence of the court or outside it was insulting and degrading to the court itself, and tended to obstruct the due course of justice. The authorities are nearly uniform that the court must determine the question. Such has been the uniform practice in the courts of this State. "Cases of contempt of court were never triable by jury, and the object of the power would be defeated in many cases if they were. The power to punish contempts summarily is incident to courts of law and equity." Cooley, Const. Lim. (4th Ed.) 394, note 2. The judicial department is entirely distinct from the legislative, and the Constitution leaves this power existing in the court as it was at the common law. The legislature enacted the following provisions in regard to contempts in courts of record:

"Every court of record shall have power to punish, as for a criminal contempt, persons guilty of either of the following acts, and no others: (1) Disorderly, contemptuous, or insolent behavior, committed during its sitting, in its immediate view and presence, and directly tending to interrupt its proceedings, or to impair the respect due to its authority; (2) any breach of the peace, noise, or disturbance directly tending to interrupt its proceedings; (3) willful disobedience of any process or order lawfully issued or made by it; (4) resistance willfully offered by any person to the lawful order or process of the court; (5) the contumacious and unlawful refusal of any person to be sworn as a witness; and, when so sworn, the like refusal to answer any legal and proper interrogatory; (6) the publication of a false or grossly inaccurate report of its proceeding; but no court can punish as a contempt the publication of true, full, and fair reports of any trial, argument, proceedings, or decision had in such court." 2 How. Stat. § 7234.

In *State* v. *Morrill*, 16 Ark. 384, in a very able and exhaustive opinion, the court discusses this power, and denies the right of the legislature to interfere with the jurisdiction of the courts on this subject. The limits imposed by the Arkansas statute are the same as in that of Michigan. The above provisions of our statute, in so far as they define contempts, are simply declaratory of the common law upon the subject. *Langdon* v. *Wayne Circuit Judges*, 76 Mich. 367. Of this statute this court there said:

" Courts of record in this State have inherent power to hear and determine all contempts of court which the superior courts of England had at the common law, and the statute has not undertaken to limit or prohibit their jurisdiction in the matter of contempts. The statutes are in affirmation of the common-law power of courts to punish for contempts, and, while not attempting to curtail the power, they have regulated the mode of proceeding and prescribed what punishment may be inflicted."

Many other States have adopted similar provisions, but whether under constitutions like our own we have not taken the time to ascertain. Usually these provisions have been found ample, and undoubtedly the desire of the courts has been to follow them without questioning the power of the legislature to absolutely control their jurisdiction in this regard. It would seem to follow that, if the legislature may curtail this jurisdiction, and determine that in no other matters than those for which it may provide shall the courts have jurisdiction, it may take away the power to punish entirely. Judges of courts of record are amenable to the people for the abuse of the power conferred upon them by the Constitution, and may be impeached. The case of Judge Peck is a notable example. In *State* v. *Morrill, supra*, the court uses this forcible language:

" The legislature may regulate the exercise of, but cannot abridge, the express or necessarily implied pow-

ers granted to this court by the Constitution. If it could, it might encroach upon both the judicial and executive departments, and draw to itself all the powers of government, and thereby destroy that admirable system of checks and balances to be found in the organic framework of both the Federal and State institutions, and a favorite theory in the governments of the American people.   As far as the act in question goes, in sanctioning the power of the courts to punish as contempts the '*acts*' therein enumerated, it is merely declaratory of what the law was before its passage.   The *prohibitory* feature of the act can be regarded as nothing more than the expression of a judicial opinion by the legislature that the courts may exercise and enforce all their constitutional powers, and answer all the useful purposes of their creation, without the necessity of punishing as a contempt any matter not enumerated in the act.   As such, it is entitled to great respect; but to say that it is absolutely binding upon the courts would be to concede that the courts have no constitutional and inherent power to punish any class of contempts, but that the whole subject is under the control of the legislative department; because, if the general assembly may deprive the courts of power to punish one class of contempts, it may go the whole length, and divest them of power to punish any contempt."

If the legislature should enact a law that courts have not the power to punish a juror for contempt for refusing to obey its mandate summoning him to appear as a juror, or if, when appearing, he should refuse to act, would such act be constitutional?   No high-minded and self-respecting lawyer would occupy the position of judge under such circumstances.   In *Cooper* v. *People*, 13 Colo. 367, it is said:

"It was said in argument by counsel for respondents 'that by the common law every judge was regarded as the direct representative of the sovereign, and upon this fiction the power to punish for contempt was based.' With us the people have been substituted for the crown. The courts are created by the people, and are dependent upon the popular will for a continuation of the powers granted.   They are the people's courts, and contemptuous conduct towards the judges in the discharge of their offi-

cial duties, tending to defeat the due administration of justice, is more than an offense against the person of the judge; it is an offense against the people's court, the dignity of which the judge should protect, however willing he may be to forego the private injury."

In *Re Woolley*, 11 Bush, 111, the court uses this language:

"We will not, in this case, determine whether, under the Constitution, the legislative department, under the guise of regulating proceedings in cases of contempts, can take from the judiciary the power to preserve its independence and equality by protecting itself against insults and indignities. The right of self-preservation is an inherent right in the courts. It is not derived from the legislature, and cannot be made to depend upon legislative will."

In *Ex parte Robinson*, 19 Wall. 510, the court said:

"The power to punish for contempts is inherent in all courts. Its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice. The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power."

In the same opinion it was doubted whether the act of Congress of March 2, 1831, upon the subject of contempts, could be held to limit the authority of the Supreme Court, which derives its existence and power from the Constitution. It was, however, held to apply to those courts which were the creatures of Congress, and not of the Constitution.

Chief Justice Wilmot, in *Rex* v. *Almon*, 8 State Tr. 59, said:

"The arraignment of the justice of the judges * * * excites in the minds of the people a general dissatisfaction with all judicial determinations, and indisposes their minds to obey them; and whenever men's allegiance to the laws is so fundamentally shaken it is the most fatal and the most dangerous obstruction of justice, and, in my opinion, calls out for a more rapid and immediate

redress than any other obstruction whatsoever; not for the sake of the judges as private individuals, but because they are the channels by which the king's justice is conveyed to the people."

See, also, *Middlebrook* v. *State*, 43 Conn. 268 (21 Am. Rep. 650).

We have referred to this subject and the authorities bearing upon it for the purpose of showing that this power of the legislature is, at least, an open question. Fortunately, it is not necessary to pass upon it in this case, and we refrain from doing so. We must not, however, be understood as assenting to the proposition that the legislature, under the guise of regulation, may destroy a constitutional power of the courts.

1. The contention of the respondent that his letter did not refer to a case pending in court cannot be maintained. The decree had not been enrolled. It was still subject to modification upon motion. The court might order a rehearing. No appeal had then been taken to this court. The costs had not been taxed, and no execution issued. Neither was it in condition to issue execution. The case cannot, therefore, be held to have reached that stage where it can be said that it was not pending in that court. *Fishback* v. *State*, 131 Ind. 304. Aside from the above consideration, however, the statute does not, in terms, limit the power to, punish for contempt to cases pending in the court. Under respondent's contention, a party may threaten to do an act, or charge corruption upon the judge, or that he has submitted to private interviews with the litigants, and, if the case is then pending, he will be subject to summary punishment by the court, but, if the decree has been pronounced, or judgment rendered, or order made, he may, the next moment, with impunity do the same acts or utter the same statements, and leave the judge to the sole remedy of an action for libel or slander. This is too narrow a construction of the law of contempts, and is not sustained by the best-considered cases. In this connection the language of Chief

Justice Kent in *Yates* v. *Lansing*, 5 Johns. 282, is applicable:

"Whenever we subject the established courts of the land to the degradation of private prosecution, we subdue their independence and destroy their authority. Instead of being venerable before the public, they become contemptible, and we thereby embolden the licentious to trample upon everything sacred in society, and to overturn those institutions which have hitherto been deemed the best guardians of civil liberty."

This question is very ably discussed in the leading case of *Com.* v. *Dandridge*, 2 Va. Cas. 408, in which case a party litigant in a suit which the court had decided met the judge shortly after on the steps leading into the courthouse, and charged him with having acted corruptly in the case.

The true rule is stated in *Neel* v. *State*, 4 Eng. (Ark.) 259 (50 Am. Dec. 209):

"By the common law, a court may punish for contemptuous conduct toward the tribunal, its process, the presiding judge, or for indignities to the judge while engaged in the performance of judicial duties in vacation, or for insults offered him in consequence of judicial acts; but indignities offered to the person of the judge in vacation, when not engaged in judicial business, and without reference to his official conduct, are not punishable as contempts."

The charges in the letter of Mr. Chadwick had direct reference to the official conduct of the judge, and not to his private character and acts. Fortunately, the occasion for the exercise of this power by the courts of this State has been infrequent. The courts have seldom, if ever, assumed jurisdiction and inflicted punishment where an enlightened public conscience has not justified it. So long as critics confine their criticisms within the facts, and base them upon the decisions of the court, they commit no contempt, no matter how severe the criticisms may be; but when they pass beyond that line, and charge that they have not had a fair trial or hearing on account of

the corruption of the presiding judge, or his listening to arguments and personal interviews out of court, the tendency is to poison the fountain of justice, and to create distrust, and destroy the confidence of the people in their courts, which are of the utmost importance to them in the protection of their rights and liberties. It is said in *Com.* v. *Dandridge:*

"And if the power of punishment stop here, a curious consequence may ensue. A man may be attached for *threatening* to do that for which he could not be attached when actually done. One says of a judge, 'If he render a certain judgment against me, I will insult or beat him.' For this he may be attached. But, if (the judgment having been rendered) the insult be actually offered, an attachment no longer lies, because the contempt is in relation to the past conduct of the judge, and to a case no longer pending. A recurrence to original principles—the only true test—by demonstrating that the weight, authority, and independence of the court may be equally assailed either way, will prove that this distinction is merely ideal."

2. It is next insisted by the respondent that he purged himself of the contempt by his answers, both to the petition and to the interrogatories, by stating that he intended no charge of improper conduct on the part of the presiding judge, and that the subsequent proceedings were, therefore, beyond the jurisdiction of the court. Where the language is susceptible of two interpretations or constructions, and the party charged asserts under oath that he did not intend the article to be construed as alleged in the innuendoes, he is purged of the contempt; but if the publication is fairly susceptible of but one construction, and its purport is to defame and degrade the court in the eyes of litigants and the public, his denial of any intended wrong does not operate to purge him of the contempt. *People* v. *Wilson,* 64 Ill. 195 (16 Am. Rep. 528); *Fishback* v. *State,* 131 Ind. 304; *Sturoc's Case,* 48 N. H. 428 (97 Am. Dec. 626); *In re Woolley, supra.*

3. It remains to be considered whether the language was of such a character that his denial of intended wrong purges from the contempt. We should be glad to so hold if we considered it possible to do so. The language, however, is susceptible, in our judgment, of but one interpretation, namely, that the defendants in that suit, the clients of the respondent, had not had a fair trial; that this was due to the action, largely, of Judge Eldredge; that the regular circuit court judge, whose duty it was to hear the case, if there were not legal obstacles in the way, was driven from the performance of his duty by persistent attacks upon him; and that Judge Eldredge had submitted to private interviews with Mrs. Botsford in regard to the case. If this language, published and scattered among the people, does not tend to throw discredit upon the courts, to create suspicion as to their fairness, and to degrade them in the eyes of the people, it would be difficult to find language which would. The publication bore its natural fruit. A public meeting was called and held, ostensibly to aid the Fitzgeralds, and to raise money to assist them in appealing their case to this court. At that meeting the name of Judge Eldredge was hissed, and there were cries from some in the audience, "To hell with Judge Eldredge!" It was disclosed by the evidence that there was no foundation whatever for the charge that Judge Vance had been driven from hearing the case, or that Judge Eldredge had submitted to private interviews with Mrs. Botsford.

We are compelled to hold that the finding of the circuit court was correct. The proceedings are therefore affirmed, and the record remanded.

MONTGOMERY, HOOKER, and MOORE, JJ., concurred. LONG, C. J., did not sit.