## OBSTRUCTION OF JUSTICE BY LIBELOUS UTTERANCES.

Common Pleas Court of Hamilton County.

IN THE MATTER OF THE PUBLICATION IN ONE OF THE DAILY
NEWSPAPERS OF CINCINNATI OF STATEMENTS PURPORTING
TO HAVE BEEN MADE AND UTTERED RESPECTING ONE OF
THE JUDGES OF THIS COURT AND THE GRAND JURY OF THIS
COUNTY NOW IN SESSION.

Decided, March 15, 1911.

*Contempt—Utterances Against a Judge and Grand Jury May Be Summarily Punished, When—Function of a Committee Appointed by the Court to Make Inquiry as to a Supposed Contempt—Common Law Rule with Reference to Contempt—Constitution of English and American Courts—Not Necessary to Prove Actual Obstruction of Justice, if the Utterance Complained of "Tended" to Obstruct the Due Administration of Justice—When a Criminal Prosecution Becomes a "Pending" Case—Section 12136.*

1. A committee appointed by the judge of a court to consider and ascertain whether a certain person has been guilty of contempt of court, acts in an advisory capacity only, and the report of its conclusions and recommendations will be either adopted or rejected by the court according as they may be founded on facts and sound law.

2. It is not the duty of such a committee to report as to whether the evidence is of such a character that a conviction can probably be obtained, or to ascertain the rules of evidence applicable to the case, but it should confine itself to a finding as to whether there is reasonable and probable ground for believing that the person named has been guilty of contempt.

3. A criminal prosecution becomes a "pending" case from the moment the indictment is returned into court, and the rules of law applicable to pending cases are thereafter applicable to such a proceeding.

4. A judge of the common pleas court may punish summarily as for contempt one guilty of uttering or publishing false and libelous matters of and concerning the judge and grand jury, if it appear that the utterance complained of tending to obstruct the due administration of justice.

GORMAN, J.

Decision on the coming in of majority and minority reports of the committee.

On February 23, 1911, this court by an entry on the journal appointed Aaron A. Ferris, Edward Barton and Clyde P. Johnson, members of the bar of Hamilton county, as a committee to consider and ascertain whether the language contained in a certain printed statement published in the Cincinnati *Enquirer* on February 22, 1911, and purporting to have been a statement of George B. Cox, was used and uttered by said Cox, and to report to this court whether in the judgment of said committee the use and utterance of said language and the publication thereof are in contempt of this court, and whether in the opinion and judgment of said committee proceedings in contempt should be instituted against said George B. Cox or against said newspaper or persons connected therewith and responsible for said publication.

The publication which the committee was to inquire into and report upon, appeared on the front page of the Cincinnati *Enquirer* in the issue of Wednesday, February 22, 1911, the day previous to the appointment of the committee, and is as follows:

"George B. Cox gave out the following statement to the public:

"As given out today, I have been indicted for perjury. That is only a pretense. I consider my indictment a political indictment, done by a Democratic judge, who drew the grand jury from his inside pocket, instead of from the wheel, which the law required. The grand jury consists of Democrats and mugwumps who call themselves Republicans. I ask the public to withhold criticism or judgment in my case until the facts are heard by public trial.

"I have lived in Cincinnati for fifty-eight years. I have been in politics for thirty-five years—that I don't consider any crime. Each and every person has a right, when he becomes twenty-one years of age, to judge which party he wishes to ally himself with. I saw fit to ally myself with the Republican party, of which I am proud, a right that every American citizen may have. My supposed indictment was brought because of testimony that I gave to the grand jury in 1906. The statement I made before the grand jury at that time was absolutely correct. At this time I don't care to correct it in any form. I have prided myself all

my life on being truthful. It hurts me at this time to have my word questioned by a Democratic judge, a Democratic prosecutor and a grand jury selected as I have stated before.

"I intend to remain in this community, the city of my birth, until such time at least that I can convince the public that the reputation I started out to make has been fulfilled to the people of the county of Hamilton, state of Ohio, regardless of Democratic interference.

"I will be ready at any time to answer to the indictment whenever the court sees fit to set the case for trial. I believe that the public will give me a fair hearing before condemning me, even if a jury selected, as I said, has not done the same. I don't believe courts should be used for political purposes. They are supposed to be fair and impartial, and as for myself I ask nothing more than the humblest citizen—a fair trial."

On the 9th day of March, 1911, the committee reported to this court the result of their proceedings, their findings of fact, conclusions thereon, and their recommendations to the court. There was a majority and a minority report. The majority report is signed by Mr. Barton and Mr. Johnson, and the minority report by Mr. Ferris.

There was also filed with the reports a transcript of the evidence and facts adduced before the committee. These reports upon the conclusion of their reading in open court, together with the transcript of the evidence, were ordered filed as a part of the records of this court, and the court reserved for consideration further order in this proceeding. The facts brought to the attention of the committee are not in the main disputed and are as follows:

The committee held several sessions, and there appeared before them Thomas H. Darby, representing George B. Cox, and Judge Miller Outcalt and Alfred C. Cassatt, representing the Cincinnati *Enquirer* and its owner. The city editor of said newspaper and one of its reporters who, together with the counsel representing them and the proprietor of the newspaper, made statements and produced evidence relative to said publication. George B. Cox did not appear before the committee, although given an opportunity to do so, but a letter was sent to the committee signed by him wherein he disclaimed any intention or

thought of disrespect for the court or the judge, who impanneled the grand jury, or the grand jury itself. He further stated that at the time of the publication uttered by him, he believed in good faith from statements made by various persons to him that the grand jury was illegally drawn, in that it had not been drawn from the wheel, and that he had meant to say that and nothing more.

The committee further found that an indictment for perjury against Cox was returned by the grand jury of said county on February 21, 1911, and that a second indictment for the same crime was returned against him on February 28, 1911, and that at the time of the publication and at the time of filing the reports the grand jury was in session exercising its functions as the grand jury of the county; that it had been impanneled on or about January 4, 1911, and has been in session nearly all the time continuously since that date; that the daily press in Cincinnati, particularly the four English daily newspapers, had been publishing prominently information as to the doings of the grand jury and the matters which they had and would have under investigation, and that they were investigating transactions in which George B. Cox was reported to have been connected; that on February 21, 1911, after George B. Cox had appeared in court and given bond, the two evening English daily papers published editions containing prominently on their front pages and elsewhere in their news columns news items concerning said indictments; that on the following morning the two English daily newspapers, the *Enquirer* and the *Commercial Tribune* published prominently in their news columns the facts concerning the indictment of Cox, and among other matters published was the above statement purporting to have been made by George B. Cox, and published as before stated on the first page of the Cincinnati *Enquirer*. That each and every day after said indictment was returned there appeared prominently in all the daily papers published in Cincinnati reference to the work of the grand jury, the names of witnesses called before them and other matters relating to the grand jury, the court and the prosecuting attorney, and especially allusions to said

George B. Cox and the indictments returned against him. The committee further found that on the afternoon of February 21, 1911, the city editor of the *Enquirer*, after a conference with the general manager, telephoned George B. Cox, asking him if he had any statement to make concerning his indictment, and his response was that if a reporter were sent to Wielert's at 6:30 P. M. of that day, he, Cox, would make a statement; that later in the day about seven o'clock the said George B. Cox met the city editor and a reporter of the *Enquirer* at Wielert's and Cox then and there dictated slowly and carefully the statement, word for word, above set out, and which was published as aforesaid on the following morning in the *Enquirer;* that the statement was taken down by the reporter in long hand, and Cox further requested the city editor aforesaid to see that the statement was sent to the Associated Press; that said statement was published as dictated and furnished to the Associated Press and sent broadcast throughout the United States to the papers using the Associated Press, and was published in whole or in part in many newspapers of the country on February 22, 1911.

The committee further find that John R. McLean is the sole owner of the *Enquirer;* that he was not in Cincinnati at the time of the publication on February 22, and had no knowledge or information that the same was to be published as aforesaid until after the publication. The committee further find that the Cincinnati *Enquirer* is a daily newspaper having on February 22 and still has a large and general circulation throughout the city of Cincinnati and Hamilton county, and that on the 22d of February, 1911, the day the article above set out was published, it circulated in and about the court house of said county wherein said judge and grand jury were holding sessions.

It is stated in the findings of fact submitted by the majority of the committee that on the afternoon of that day (February 22) the two evening Cincinnati daily papers published prominently the fact that the judge presiding in the criminal room announced that the publication had come to his attention and that he would appoint a committee on the following day to consider and advise him whether the same was contempt, and that

one of these papers contained an editoral reflecting upon the accused in connection therewith and with the indictment. The court on reading over the evidence has been unable to find anything upon which this statement is based, nor is he able to see the pertinency of referring to an editorial in another paper reflecting on the accused. If that paper is guilty of contempt there should be proceedings taken against it.

The committee further find that George B. Cox is and has been for a long time, twenty years or more, prominent in politics, and a reputed leader of a large following in one of the dominant political parties, and that his reputation is general throughout the nation; that the judge now presiding in the criminal room (No. 6) in which said grand jury reported, and the prosecuting attorney of the county, are known as members of a political party opposite to that to which Cox claims that he is allied.

The committee further find that there are nine judges of the Court of Common Pleas of Hamilton County, and that under the rules thereof they alternate in different rooms, so that each judge, generally speaking, devotes one-ninth of his time to the supervision of the work of the grand jury and to the trial of criminal cases.

The committee further find that the language contained in said statement published as aforesaid was used and uttered by George B. Cox, and that he did intend and expect that the statement would be published in the Cincinnati *Enquirer* on the following day; that the proprietor of that paper is in no respect personally responsible for the publication, but that the managing editor, city editor and reporter are responsible for the publication thereof in the newspaper.

Upon the reading of the reports to the court, it was manifest that while there was no substantial difference as to the facts, the majority and the minority of the committee differed widely as to their conclusions applicable to the facts.

These differences may be summed up under three heads, viz.:

1. They differ as to the character of a court of common pleas and its jurisdiction to punish summarily as for

contempt the publication or uttering of false and libelous matters concerning the judge and the grand jury which tend to impede or obstruct the administration of justice.

2.   They differ as to their conception of the scope of the committee's authority and their interpretation of the law applicable to contempt cases.

3.   They differ in their recommendations to the court as to the course that should be pursued with reference to this publication and those concerned in its utterance.

It is now a question for this court to determine which of these reports, and to what extent, the court shall adopt, and which, if either, of the recommendations thereof shall be followed.

At the outset, it may be well to bear in mind that the court did not delegate to this committee, nor could it so delegate, the power or authority to determine whether George B. Cox or the persons connected with the Cincinnati *Enquirer* who are responsible for the publication of this libel on the court and grand jury are guilty of contempt.   That question in the very nature of things under our system of law, as administered from the earliest times, can only be determined by the court or a judge thereof. The scope of the committee's duties might be likened to the work of a grand jury in inquiring into the violations of the criminal law.   They were not to try and determine the question of the guilt or innocence of the parties under inquiry, but to determine whether or not in their opinion there was reasonable ground for preferring contempt charges against the persons under investigation.   The court might in the first instance have assumed the responsibility and determined that contempt charges should be filed against Cox and the newspaper, and have appointed a committee to prosecute these charges before the court.

Therefore, since the question is finally one for the court to decide and not for the committee, the court is under no legal obligation to accept or adopt the conclusions and recommendations of either the majority or the minority, nor is he under any moral obligation to accept or adopt them or either of them, unless the conclusions deducible from the found facts and the inferences to be drawn from them, are sound in law.   We shall

therefore take up and analyze these two reports with a view to ascertaining which, if either, reflect the law of Ohio as applicable to the facts shown in this inquiry.

The report of the majority sets out by assuming that this inquiry involves the consideration of criminal contempts as distinguished from civil contempts; that upon the return of the indictment against Cox on February 21, the prosecution or action was pending; that by its use of the word libel the committee includes all kinds of defamation spoken, written or printed, and that the law with respect to interference with the writs or processes of the court or the misconduct of its officers, is not involved in this inquiry.

The court is in accord with these assumptions of the majority of the committee and concurs therein that these matters are not involved.

It is undoubtedly true that Section 12136, General Code, under which the proceedings for contempt can be maintained, if at all, in the matters under consideration, is but declaratory of the rule of the common law of England and this country as modified, and that the foundation of this statute rests upon that ancient common law. This statute is found in substantially the same words in the legislative code of all our states and territories and in the Revised Statutes of the United States. It is very brief and to the point:

"A court or judge at chambers, summarily may punish a person guilty of misbehavior in the presence of or so near the court as to obstruct the administration of justice."

This is substantially the definition of direct contempt at common law. See 4 Blackstone, pp. 285-286. It is stated that by the common law of England in the time of Blackstone and before and since, the high courts could and did punish summarily as for contempt a libel, or scurrilous or disrespectful publication concerning the judges of those courts, although the same had no reference to a pending case; and of course if the publication was with reference to a pending case, the contempt was much more flagrant. No case will be found decided by any court in the United Kingdom or the colonies or in this country, which

holds that a false libel published of and concerning the judge, the grand or petit jury, *concerning a pending case,* which impedes, obstructs, interferes with or *tends* to impede, or obstruct or interfere with the administration of justice, will not summarily be punished as a contempt of court.

In the case under consideration it is admitted by both the majority and minority of the committee that the prosecution against George B. Cox was pending from the instant the indictment was returned into the court; and this was the day prior to the publication under consideration. All those cases in which it was found or shown that the publication did not tend to obstruct the administration of justice, may be dismissed from our consideration, as it is undoubtedly true that for a false or malicious libel on a judge, or a grand or petit juror in a cause or matter not pending, the weight of authority is to the effect that contempt proceedings will not lie, but the remedy of the person feeling himself aggrieved in such a case is that of any other person, a civil action in damages for defamation.

Notwithstanding the statement in the report of the majority that in England the punishment for libelous attacks on the judges of the high court as a contempt has become obsolete, the authorities do not support this assertion. Two decisions of the privy council are cited in support of this statement, but when it is considered that these decisions of the privy council are not binding on the judges of the high court, they can scarcely be said to settle this holding as the rule of law prevailing in England in the face of a decision to the contrary rendered after these cases were decided, in the case of *Queen* v. *Gray,* 2 Queen's Bench Division, p. 39 (1900).

The majority report then proceeds to point out that even though the law may not be as laid down in the authorities cited as to punishing as for contempt a libel on the judges of the high court, nevertheless it has never been the law in England that a county court of record, *corresponding to our common pleas court,* has power to punish as a contempt a newspaper publication which does not obstruct the administration of justice in a pending case. This statement might be dismissed with the remark

that the discussion of this proposition is entirely beside the question now under consideration, to-wit: the obstruction of the administration of justice *in a pending case*. But the statement that a county court of record in England corresponds to our common pleas court, can not be permitted to go unchallenged.

Prior to 1873, the date of the passage of the Judicature Act, the high courts of England which were designated and known as the superior courts as distinguished from inferior courts of limited jurisdiction, were, first: the superior courts of common law, comprising the King's or Queen's Bench—the court of common pleas, and the court of exchequer, and second the high court of chancery. All these courts met at Westminster up to 1882 when the new Law Courts building, standing near the ancient Temple Bar in London, was formally opened, and since that time all the courts have there had their common seat. The court of common pleas had jurisdiction of all civil causes of every description between the subjects of the realm and at the time of its origin, at least as early as Magna Charta, and according to Lord Coke, it existed before Magna Charta, it was the only superior or high court having such jurisdiction. Because it was the court for the trial of causes between subjects, the causes of the common people, it received its name, common pleas, being so called to distinguish it from the pleas of the crown. It was also called the common bench. It consisted of a chief justice and five associate or puisne justices. The Queen's or King's Bench was the principal court of criminal jurisdiction, and the court of exchequer was the lowest in rank of the supreior or high courts, and originally had jurisdiction only in cases of injury to the revenues of the kingdom. This court of common pleas was of very ancient origin and has been considered as the principal seat of the learning relative to ordinary actions between man and man, and was styled by Lord Coke as "the lock and key of the common law." It is mentioned in the eleventh, twelfth and thirteenth chapters of Magna Charta, and Glanville says it existed before Magna Charta. See *3 Blackstone's Com.*, 37-40; *Glanville Lib.*, 2 C., 6; *Reeves History English Law*, 57-58; *4 Institutes*, 99.

Now the inferior courts of England were the county courts and they were below the three superior or high courts of the realm, administering the law. There were also other inferior courts of England besides the county courts, attached to certain cities and burroughs and having ancient charters to exercise jurisdiction in certain cases. Outside of London there were fifty-eight county court circuits. The jurisdiction of these county courts was limited on the law side to cases involving £50, or less, and on the equity side to all cases involving £500 or less. The county court jury consisted of five persons, whereas the jury in the high or superior courts consisted of twelve. See *3 Blackstone*, 35-36; *Reeves Hist. Eng. Law*, 7. It was not a court of record. *3 Blackstone*, p. 35.

It will thus be seen that in England the court of common pleas was not a county court, but on the contrary, one of the three high courts of law, and that the county courts there were, not at all like our common pleas court, a court of record with almost unlimited original jurisdiction.

Our common pleas court is even of larger and wider jurisdiction than in England, for it has jurisdiction not only in civil actions but it also has all the jurisdiction originally exercised in criminal cases by the court of Queen's or King's Bench, the Exchequer and the Court of Chancery. It is a constitutional court, and its jurisdiction was defined when the state Constitution was adopted in 1851, and recognized and treated in that fundamental law of the state as of equal importance with the Supreme Court of the state. It is not a county court, nor is its jurisdiction limited by county lines.

By the provisions of Article IV, Section 1 of the Constitution of 1851, the judicial power of this state is vested in a supreme court, circuits courts, courts of common pleas, and such other courts inferior to the Supreme Court as the General Assembly may from time to time establish.

The state is divided into nine common pleas districts and every district embraces more than one county, except Hamilton county; and it is provided that courts of common pleas shall be held in every county in the district by one or more of the judges as often as provided by law, and shall have such jurisdiction as

is fixed by law. The supreme and circuit courts by the Constitution have original jurisdiction in *quo warranto, mandamus, habeas corpus,* and *procedendo* and such appellate jurisdiction as may be provided by law. By statute the jurisdictions not provided for by the Constitution are defined and prescribed.

We are unable, in view of the history and jurisdiction of the court of common pleas, both in this country and in England, to subscribe to the declaration that a county court of record in England corresponds to our court of common pleas. The probate court in this state is a county court of record. A county court's jurisdiction is usually confined to the county, both in England and in this country, and is usually a court of inferior jurisdiction to the common pleas court.

The cases cited arising in the county courts in the report of the majority of the committee can not have any application to a case involving the court of common pleas. Especially is this true with reference to English County Court cases, because of the limited jurisdiction of such courts.

The case of *Queen* v. *Lefroy* (1873), Law Reports, 8 Queen's Bench, 134, cited several times by the majority of the committee, can not be an authority upon the question under consideration, because that involved a publication concerning a county court in England, of limited jurisdiction, with power to punish only for contempts committed *in the presence of the court.* The same statement will apply to all other decisions of courts, inferior in jurisdiction to the four high courts of England. Nor does it result from the decision in the Lefroy case that the court of common pleas has no broader jurisdiction in this state than that conferred by Section 12136, General Code, to punish summarily for contempt; but, as will be presently shown, and as we believe it follows from what has been shown as to the character, jurisdiction and high standing of our court of common pleas, its jurisdiction in this regard is as broad as that of the common pleas court or the Queen's Bench of England in the days prior to 1873.

It is not deemed necessary to refer to and distinguish the numerous federal decisions and decisions of other states of this

Union, cited by the majority of the committee on the point of the power and authority of the court of common pleas or the nisi prius courts to punish libels on the judges and juries as for contempts, as we are satisfied that the decisions of the courts of this state are as full and convincing as those from the federal courts or those from other states; but a few of these will be noted in passing. It is true, as stated in the report of the majority, that the common law of Ohio is not necessarily the common law of England; but it is the same, except where it may have been modified by statute or by decisions of our courts holding it inconsistent with the genus and spirit of our institutions or inapplicable to our condition and circumstances, as differing from those of England.

It might not be a safe guide to follow the federal decisions on the question of whether or not the common law gave the right to punish as for contempt in cases similar to the one under consideration, in view of the fact that the common law constitutes no part of our national jurisprudence. *Wheaton* v. *Peters,* 8 Pet., 658; *Butcher* v. *Cheshire R. R. Co.,* 125 U. S., 558; *Forepaugh* v. *Delaware, etc., R. R. Co.,* 128 Pa. St., 217.

In addition to the cases cited in the report of the majority sustaining the power of the courts to punish irrespective of an actual obstruction of justice, viz.: *Attorney-General* v. *Hildreth,* 82 Vt., 387, and *State* v. *Sheppard,* 177 Mo., 205, there will be found the case of *Fishback* v. *State,* 131 Ind., 304, which case holds just the contrary to the case of *Story* v. *People,* 79 Ill., cited on page 26 of the report of the majority of the committee.. There are not wanting respectable authorities in addition to those just noted, which hold that superior courts have power to punish for contempt, libels on the court or juries regardless of whether or not they obstruct the administration of justice, or tend thereto, but we need not concern ourselves about such cases, as we are satisfied that the case under consideration does not fall under that class of cases.

The majority of the committee have devoted much space toward establishing the rule of evidence applicable to contempt cases, and have cited numerous authorities in support of their

contention that the evidence to warrant a finding of contempt against Cox or the Cincinnati *Enquirer*, must establish a contempt beyond a reasonable doubt. Assuming that this is the true rule, was it the province of the committee to determine that the evidence did not tend to establish the contempt beyond a reasonable doubt? Under the authority granted to the committee, was it not their duty to determine only whether or not there was reasonable and probable grounds for believing that a contempt had been committed? The committee under their authority could no more try the question of the guilt or innocence of the parties under investigation, than the grand jury could hear and determine the question of the guilt or innocence of the accused. The indictment is the legal form of the accusation in criminal cases, and is returned not upon proof beyond a reasonable doubt, but upon reasonable and probable grounds for an indictment, founded upon the evidence before the grand jury. The committee with reference to this contempt matter was, in the opinion of the court, to occupy a position similar to that of a grand jury in criminal cases. The court on a complaint being filed, if it were filed, would hear and determine the guilt or innocence of the persons charged in the complaint, and in this way a legal, orderly and final determination of the matter could be reached. If guilty, or innocent, the records would reveal that fact. However, the fact that the majority of the committee decided to determine and report to the court the degree of proof that would be required to establish a case of contempt, is not a matter of so much importance, as the question of whether or not the facts, applying the rule of ''beyond a reasonable doubt,'' warrant the conclusion that a contempt had been committed. The importance of the committee not determining the question of the guilt or innocence of the person under investigation is, that such finding by the committee should not be taken as a precedent, which the courts might feel bound to follow. And this phase of the matter is brought to the court's attention by the attitude and reports of the daily press in reporting the finding of the committee read in open court.

At least three of the daily papers published in Cincinnati either stated that George B. Cox was not guilty of contempt, or

that there was no foundation for the charges, or that he had been acquitted. The impression created on the public mind in many instances was that the committee had tried and acquitted Cox and the *Enquirer* of the charge of contempt. Of course this was not and could not be done by a committee.

In the conclusions of law and fact found by the majority, it is stated that inasmuch as there are nine judges on the common pleas bench of this county, if any judge feels himself affected by a libelous publication, so as to doubt his ability to conduct a trial, as though no such publication has been made, he need not hear the case; but this is scarcely an answer or a remedy to apply in contempt cases. The courts and juries, not the individual judges and juries, have the right to protect themselves and be protected against libelous attacks that tend to impair their standing before the public and obstruct the administration of justice.

The effect of such publications, as the one under consideration, were set forth in the cases of *Myers* v. *State,* 46 O. S., 473, *Ellspeman* v. *State,* 3 N.P.(N.S.), 593 (affirmed by the Supreme Court without report in 78 O. S., 394), and several other cases which will be hereafter cited and commented upon. The test is not whether the publication did obstruct, impede or interfere with the administration of justice, but did it tend to do so, or was it calculated to have that effect. It is rather poor satisfaction to be told by the libelor that the judge need not try the case, or that the grand jury does not appear to have been deterred from bringing another indictment against the party committing the libel.

In the 7th Volume of the American & English Encyclopedia of Law, 2d Edition, at page 59, the following rule is laid down:

"The publication of inaccurate accounts of pending causes, or of matter which has a *tendency* to prejudice the public as to the merits, or of matter *tending* to bring the court into disrepute, and thus interfere with the due administration of justice, has always been regarded as contempt of court."

Authorities in great number are cited from the English and Canadian reports and from the federal reports, and from seven-

teen of the states of the Union, among them several of the cases citen by the majority of the committee.   Some of the cases here cited, are:   *In re Printer of St. James Evening Post*, 2d Atk., 469;   *In re Chettanham, etc., Ry. Co.*, Law Rep., 8 Eq., 580; *Hollingsworth* v. *Duane*, Wallace (C. C.), 77-102;   *Ex parte Barry*, 85 Cal., 603;   *Bloom* v. *People*, 23 Colo., 416;   *People* v. *Wilson*, 64 Ill., 196;   *Cheedle* v. *State*, 110 Ind., 301;   *State* v. *Anderson*, 40 Ia., 207;   *Rosewater* v. *State*, 47 Neb., 630;   *Matter of Sturoc*, 48 N. H., 428;   *Matter of Cheeseman*, 49 N. J. L., 115; *Matter of Bronson*, 12 Johns. (N. Y.), 460;   *Ex parte Briggs*, 64 N. C., 202;   *Myers* v. *State*, 46 O. S., 473;   *State* v. *Kiser*, 20 Ore., 50;   *Respublica* v. *Oswald*, 1 Dall (Pa.), 319;   *State* v. *Prew*, 24 W. Va., 416.

The case of *Cuyler* v. *Atlantic & North R. R. Co.*, 131 Fed. Rep., 95, was a criticism of the court with reference to a past transaction, the appointment of a receiver, and the publication was not in the presence of the court, or so near thereto, the court found, as to tend to impede or interfere with the administration of justice.   This case is not similar to the Myers case, 46 O. S., nor is it similar to the case under consideration, as will be apparent from a reading of the facts.

The court is unable to see the force of the statement contained in the majority of the report on page thirty-one, that in view of the fact that in another Cincinnati newspaper there appeared on the evening of the same day that Cox's statement appeared. a full account covering two or three pages of news columns, accompanied by an editorial, referring especially to this indictment, and reflecting on George B. Cox in connection therewith, that this article might fairly be set off against the publication in the *Enquirer*.   Surely the court and grand jury are not, in the absence of evidence, to be held responsible for this publication in a paper other than the *Enquirer*, reflecting on George B. Cox.   If this publication was wrong, then it can not be set off against the publication in the *Enquirer;* two wrongs do not make a right; nor is the offense of those responsible for the *Enquirer* publication mitigated by the fact that another paper libeled Cox, and may also have been guilty of contempt.   The

doctrine of set-off can hardly be applied to the commission of offenses, criminal or *quasi*-criminal. If the majority of the committee, or Mr. Cox, feel that a publication reflects on Cox, the court will be glad to take up this matter, if his attention is directed to the publication; but it seems hardly fair to say that the court should not complain of Cox's contemptuous conduct, because Cox has been libeled and prejudicied by a publication subsequently made in another newspaper.

As to the latest English case cited and copiously quoted from on pages 33 and 34 of the report wherein Lord Chief Justice O'Brien delivered the opinion of the court, and referred to John Burns' speech in reference to the *Standard,* which was the defendant in twelve libel suits, and concerning the matters involved in those suits, Burns spoke, it may be said, that it is one thing to speak about the conduct of a party to a litigation and to criticise that conduct pending the cause, and quite another thing to speak or publish a libel of the court and jury that may be trying the cause. We are unable to see any parallel between that case and the one under consideration. It is urged twice, at least, in the majority's report, that neither Cox nor the *Enquirer* have repeated the libel or been guilty of additional offense since the first publication. Well, a failure to repeat the offense can only be urged in mitigation of the punishment, if found guilty. A repetition would be an aggravation of the offense, and it is not clear why action should not be taken against the parties merely because they have not been as offensive as they might have been. The court finds itself unable to concur with the majority of the committee in its conclusions of law on the undisputed facts; and this decision of the court is regrettable, because of the high character and standing of the majority of the committee as lawyers at this bar, and as distinguished citizens of this community. They have expended a tremendous amount of labor and research in collecting the authorities cited, and in the preparation of their report, and the court would be pleased if he could find himself in accord with their views.

Now as to the report of the minority, signed by Mr. Ferris, the court has given it the same careful consideration that was

bestowed on the majority report, has examined and considered the authorities cited therein, and others not cited by either the majority or the minority of the committee, and shall now endeavor to present his views, and the conclusions reached.

In this connection the court desires to express his sincere thanks for the great labor imposed by the minority member of the committee upon himself, in investigating the authorities, collecting the same and in the preparation and presentation of his report. No man at this bar, or in this community, stands higher in the estimation of those who know him than the minority member of this committee. His worth and unselfish patriotism and devotion to public duty are proverbial in this community.

Upon the facts found from the evidence, the minority has differed from the majority of the committee, not only as to the conclusions of law to be drawn therefrom, but he also differs as to the inferences that may be drawn from these facts in some particulars, and in his conception of the scope of the committee's authority, and he also differs from them in recommending the course that should be pursued by the court.

The court agrees with the minority in his conclusions that Mr. Cox in his statement published February 22 meant more than he says he meant in his letter to the committee, wherein he stated that he only meant to criticise the manner of drawing and impanneling the jury. The conclusion is irresistible from a reading of this statement and a consideration of the cool, deliberate manner of dictating it, several hours after his indictment, and his final directions to give it to the Associated Press, so that it might be heralded broadcast over the country, that his intention was to try to bias and prejudice the public in his favor, and against the grand jury that indicted him, and the judge that impanneled the grand jury. He was evidently trying his case in the newspapers beforehand, on his *ex parte* statement to the public. He sought to discredit the judge and show that he was unfair and pursued illegal methods to procure a partisan grand jury to indict him. He had, at that time, an opportunity to consult an attorney and be governed by his advice, before throwing out a false and scurrilous statement. There can be no doubt·

in the mind of any fair minded person that his motives were sinister and that he intended far more than he says in his letter to the committee.

Now was this statement in contempt of court, applying the rule of common law, either as now held in England or in this country, or was it contempt under our statute and the decisions of our own Ohio courts and other decisions of other state and federal courts in cases presenting the same or like circumstances?

Section 12136, General Code, is the section which warrants the court in taking action, if the conduct falls within the scope and purview of this section. It reads as follows:

"A court or judge at chambers, summarily may punish a person guilty of misbehavior in the presence of, or *so near* the court or judge as to obstruct the administration of justice."

Blackstone, in his Commentaries, Book 4, pp. 283-285, discusses the scope of the court's power to punish for contempt at common law, and says that contempts consist, among other things, not only of misbehavior in the face or presence of the court, but by speaking or writing contemptuously of the court or judges acting in their judicial capacity; by printing false accounts of causes then depending in judgment, and other matters stated by him. It has been held to be contempt of court to print, publish or utter statements true or false, with reference to a pending cause that tend to impede, obstruct or interfere with the administration of justice, if the acts are done so near the place where the court is held, as to be calculated to produce these effects. It is not the obstruction alone that constitutes contempt, but it is whether the acts tend toward that end, or are calculated to produce that effect.

In *Commonwealth* v. *Oswald*, 1 Dall (Pa.), 319, one Oswald was charged with contempt for publishing a printed statement reflecting on the court while a cause in which he was a party was pending and the court found him guilty of contempt for so doing.

*In re Cheeseman*, 49 N. J. L., 115, was a case in which Cheeseman published an article in a newspaper tending to cast discredit

on a grand jury which had indicted him, upon the sheriff and upon the judge who had charge of the grand jury and who in the regular course of business would be called upon to preside at Cheeseman's trial, if brought to trial. The court held him guilty of contempt, and said that one could be furnished summarily for words uttered by speech, writing or printing, outside of the regular course of litigation, which were *designed* to bring contempt upon the courts in the exercise of judicial functions, or to pervert, in a pending cause, the due administration of justice.

In Sturoc's case, 48 N. H., 428, the court held that a publication in the New Hampshire *Argus and Spectator* respecting the character of a criminal prosecution then pending, if made and published at the time and under circumstances that would bring it to the attention of the jury and others in attendance, was contempt of court. To the same effect are the cases of *In re Taylor*, 64 Cal., 434; *State, ex rel Phelps*, v. *Judge*, 45 La. Ann., 1250; *Bloom* v. *People*, 23 Colo., 416.

In *People* v. *Wilson*, 64 Ill., 195, it was held that any publication by parties or strangers concerning a case pending and which *had a tendency* to prejudice the public concerning the merits of the case, and to corrupt the administration of justice, or which reflects upon the tribunal, or its proceedings or on the parties, jurors, witnesses or counsel may be punished as a contempt.

The case of *U. S.* v. *Duane*, Wallace's Report, page 102 (C. C.), is one of the oldest cases and a leading one, decided in 1801, holds that a publication reflecting on the court in a pending cause is contempt of court.

There are numerous cases that hold it to be a contempt of court to speak or write, print or publish, scurrilous and insulting language to or concerning a court *after a case has been finally decided* and when it is no longer pending. See the following among others that so hold: *Commonwealth* v. *Dandridge*, 2 Va. Cas., 409; *In re Pryor*, 18 Kas., 72; *In re Wooley*, 11 Bush., 95; *In re Chadwick* (Mich.), 67 N. W., 1071; *Fishback* v. *State*, 131 Ind., 304.

But in the case under consideration it is not necessary to go to the lengths which the courts went in these cases, because it is found, and this finding is undoubtedly correct, by both the majority and the minority committee, that the case against Cox was pending when the publication was made on February 22, and under such circumstances the only question to determine is, whether or not the publication obstructed, or tended, or was calculated to impede or obstruct justice.

But it is scarcely necessary to go outside of Ohio for authorities which support and most strongly support the finding of the minority that this publication was contempt of court. We shall here note a few of these cases.

In *State* v. *Goff*, Wright's R., page 78, the Supreme Court held that it was contempt of court to muster and examine a militia company with martial music so near the court house as to disturb the court.

The case of *Myers* v. *State*, 46 O. S., 473, has been cited and commented upon freely by both the majority and minority of the committee. This was the case in which Allen O. Myers was charged with contempt of court before Judge Pugh of the Common Pleas Court of Franklin County. Myers was under indictment, jointly with one Montgomery, which indictment had a short time prior to the publication been returned by the grand jury of Franklin county. Myers had asked for a separate trial and while Montgomery was on trial, but before he himself had been brought to trial, Myers wrote an article at Cincinnati and caused it to be published in the Cincinnati *Enquirer,* in which among other things he published and said that the grand jury which found the indictment against himself and Montgomery, was called by the judge of the Common Pleas Court of Franklin County, who was then presiding, for a special partisan purpose and was never honestly drawn from the box. · The newspaper had an extended circulation in Columbus and was circulated and read in and about the court house there, all of which was known to Myers. The Supreme Court held that such conduct was contempt of court under Section 5639, Revised Statutes, now Section 12136, General Code. The court on page 491 says:

"It was not the libel against the judge which constituted the offense for which the respondent was liable as for a contempt of court. *The offense consisted in the tendency of his acts to prevent a fair trial of the cause then pending in the court.* It is this offense which constitutes the contempt and for which he should be punished summarily; and the fact that he also libeled the judge and may be proceeded against by indictment therefor, is no reason why he may not and should not be punished for the offense against the administration of justice."

It will be observed that the court did not find nor does the record show that the administration of justice *was* obstructed, although it was claimed by counsel for Myers in this case, as is contended for by the majority of the committee in the case under consideration, that there could be no contempt of court unless the administration of justice *was obstructed.* It was also claimed in this Myers case, as it is maintained by the majority of the committee here, that the court could resort to the criminal statutes to punish the offender, if it was desired, but it will be noticed that the court said that notwithstanding the fact that Myers might be punished under the criminal statutes, nevertheless he was liable for contempt also.

In *Steube* v. *State,* 3 C. C., 383, the court held that it was contempt of court, occurring so near the court as to impede the administration of justice, for one to assault, strike and wound the prosecuting attorney of the county at a point two-thirds of a mile from the court house, said prosecuting attorney at the time being engaged in the prosecution of a criminal case, but the court had adjourned two hours before the assault and the prosecuting attorney at the time was on the street talking to a friend. In deciding the case Judge Stewart said on page 387:

"Treating this as a proceeding under Section 5639, R. S. [12136, General Code], which in our judgment is but declaratory of the common law, it is not necessary to aver or prove intent. Whoever by misconduct obstructs the administration of justice does so at his peril and is guilty of contempt. It is clear that this assault delayed the trial of the case then on hearing. And having attacked an officer of the court, who is under its protection, he thereby did an act *the natural tendency* of which was to obstruct and degrade the administration of justice."

It was also held in this case that the word "contempt" must be recognized in its legal sense as defined at common law, and that in this sense the Legislature intended to use it with reference to Section 5639, Revised Statutes, now Section 12136, General Code.

In the case of *Post* v. *State*, 14 C. C., p. 111, while the court held there was no contempt in libeling the judge *after the case had been finally terminated*, yet they say on page 120:

"Two classes of cases involving the publication of newspaper comments upon proceedings in court have been considered in contempt proceedings; those in which it is claimed that the object of the publication was to affect the decision of a pending cause or action; second, those which have for their apparent purpose the bringing of courts or judges or other officers constituting an essential part thereof, into discredit."

In *Hale* v. *State*, 55 O. S., 210, the Supreme Court held that the General Assembly is without authority to abridge the power of a court *created by the Constitution* to punish contempts summarily, such power being inherent and necessary to the exercise of judicial functions. The court on page 213 says:

"Such powers from both their nature and their ancient exercise, must be regarded as inherent. They do not depend upon the express constitutional grant nor in any sense upon the legislative will. The power to *maintain order*, to secure the attendance of witnesses to the end that the rights of parties may be ascertained, and to enforce process to the end that effect may be given to their judgments, must inhere in every court or the purpose of its creation fails. Without such power no other could be exercised."

In other words the court holds in this case that without the enactment of Sections 5639 and 5640, Revised Statutes, now Sections 12136 and 12137, General Code, the common pleas court, a constitutional court, could as at common law punish summarily for misbehavior that obstructed or tended to obstruct the administration of justice.

In *Mengert* v. *News Company*, 6 Nisi Prius (N. S.), 572, the court held that where the publisher of a newspaper charges one of the parties to the action, *then about to be tried*, with mis-

conduct with reference to the other party and the criticism is of a character and is made in a manner calculated to prevent a fair trial, he is guilty of a contempt of court. The court in this case refers to the Myers case, 46 O. S., and says, *we must distinguish between an attack on the parties and an attack on the court.*

In answer to the objection, if we understand rightly, of the majority of the committee that there is no common law power or authority to punish summarily as for contempt the things set out in Section 12136, and that that section furnishes and measures the extent of the common pleas court's power to punish summarily, we would refer to the decision of our circuit court in the case of *Ex parte Morris*, 8 C.C. (N.S.), page 212, where the court says:

"While courts do not derive their power to punish for contempt from any statute, it is their duty to conform to a statute which does not abridge this power, but simply points out the manner in which it shall be exercised."

But if a case is needed which may be said to be on all fours with the case at bar, it is that of *State* v. *Ellsperman*, 3 N.P. (N.S.), 593. This case was affirmed by the Supreme Court without report in 78 O. S., page 394, and is therefore the latest expression on the subject of libelous contempt adopted by our Supreme Court.

In this case Ellsperman was the owner and publisher of the *Sunday News*, a paper published at Zanesville, Ohio. On October 11, 1905, there was returned into the Common Pleas Court of Muskingum County two indictments against Ellsperman, charging him with publishing a criminal libel against Henry L. Greiner. The grand jury two days later, on October 13, adjourned to November 13, 1905. On the 15th of October, Sunday, Ellsperman published in his *Sunday News* a malicious and flagrant libel on the grand jury, charging in substance that the indictments were returned in order to blackmail him and that the grand jury was corrupt and venal and would indict any one for money. Charges of contempt were thereupon filed against Ellsperman, setting out the publication of the scurrilous newspaper article as the contempt. The court had not yet begun to try

Ellsperman upon the indictments, indeed it does not appear that he had been arraigned. The court heard the evidence on the contempt charges and there was no denial of the publication, and the falsity of the publication was established. The court found Ellsperman guilty of contempt of court and fined him $250 and costs, and committed him to the work house until the fine and costs were paid, or until he be otherwise discharged by law. There was no other question involved except the question of whether or not the defendant was guilty of contempt in law. The circuit court affirmed the common pleas and the Supreme Court on error, prosecuted by Ellsperman, affirmed the circuit court as before stated, without report, 78 O. S., 394. The court in this case said:

"The publication of charges to the effect that certain indictments returned by the grand jury were procured through fraud, blackmail and bribery, does not become privileged matter by reason of the fact that the charges relate to past acts as distinguished from those which are prospective.

"The grand jury is a component part of the court and the publication of such charges without evidence upon which to base them is *calculated* to impede the administration of justice and is contempt of court for which summary punishment may be visited on the guilty parties."

In deciding the case the court cites several authorities in support of its position and shows that the case of *Story* v. *State,* 79 Ill., 45, cited approvingly by the majority of the committee, should not be followed, but does approve the case of *Fishback* v. *State,* 131 Ind., 304, which holds just the contrary to what is decided in 79 Ill., *supra.* It holds that a publication reflecting on the grand jury tending to bring them into disrepute, is subject to the cognizance of the court, and the author thereof is liable for contempt.

It would seem to the court that this case of *Ellsperman* v. *State* is decisive of the question of the liability of George B. Cox for contempt, whatever may be said of the persons responsible for the publication in the *Enquirer.*

As indicating how tenaciously the Supreme Court adheres to the doctrine laid down in the Hale case, 55 O. S., and the Myers

case, 46 O. S., it will be interesting to note what the court has said in the Thatcher case; a disbarment proceeding, 80 O. S., 492, on pp. 653 and 667.   On page 653, Davis, J., announcing the opinion of the court, says:

"The power of *any* court to protect itself from contempts is generally conceded.   At least it was held by this court in *Hale* v. *State,* 55 O. S., 210, that such power is inherent and necessary to the exercise of judicial functions, and that it is not within the authority of the General Assembly to abridge such power as to a court created by the Constitution."

That means the common pleas court, whether it be a county court or not.   And on page 667 of this last report, Judge Davis says:

"The rancor of personal feeling appears in almost every line of the publication issued by the respondent.   The view of this court as to *the effect* of such publications is very well indicated in the following extracts from a *per curiam* opinion in *Myers* v. *State,* 46 O. S., 489:
"The article was a libel upon the presiding judge, but that alone did not form the basis of the information.   The intention of the publication was to insult and intimidate the judge, degrade his court, destroy its power and influence and thus bring it into contempt; to inflame the prejudices of the people against it; to lead them to believe that the trial then conducted was a farce and wrong on the part of the judge and other officers of the court, and if communicated to the jury to prejudice their minds and thus prevent a fair trial," etc.

There is no doubt in the mind of the court that George B. Cox, when he published his insolent and false statement on February 22, concerning this court and the grand jury, fully intended to produce just such effect as the Supreme Court says the statement in the Myers case, *supra,* was intended and calculated to produce.   In the opinion of this court by that publication George B. Cox was willfully and maliciously guilty of a gross contempt of court, and the majesty of the law should be vindicated by punishment meted out to him proportionate to his offense.   In view of what has been said it is scarcely necessary for the court to say, that with all due respect for the splendid abilities and brilliant qualities of mind displayed by the majority of the com-

mittee, the court is forced to coincide with the views of the law expressed by Mr. Ferris in his minority report. But inasmuch as it is important that the main cause of action against George B. Cox, to-wit, the indictment for perjury, be not lost sight of or overshadowed by contempt proceedings; and in view of the affidavit of bias and prejudice against this individual member of the common pleas court filed by Cox since this committee was appointed, it might be charged by some of his partisans and followers, if such there be at this time, that this individual member of this court is pursuing him with vindictiveness and bias, it is considered by this court to be in the interest of larger justice and best for the orderly and decorous administration of the law in this community that no charges of contempt be preferred against said Cox at this time. If my associates on this bench shall deem it hereafter, in the interest of justice, to take up and prosecute this charge before another member of this court, it would appear to me that this would be a proper solution of the matter, inasmuch as every member of this court is concerned and interested in preserving and maintaining the dignity of the people's sovereignty, lodged in this honorable and ancient court of common pleas, the court of the common people.

As to the recommendation of both the majority and the minority of the committee with reference to the Cincinnati *Enquirer* and those concerned in publishing it, the court is of the opinion that no proceeding should be taken against it or them, but that a public apology or statement should be made in as conspicuous a place and manner as the former statement was made.

At this time I again desire to express my heartfelt thanks to the members of this committee who have so nobly responded to the call made upon them by me. The court would be glad to make them a suitable allowance for their labors, but has been given to understand that they would decline any compensation. The committee will be relieved from any further burdens incident to this matter, with fullest appreciation on the part of the court of their efforts to aid him.

Let an entry be made on the records of this court in accordance with the findings herein contained.